1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REFUGIO CARRILLO, | Case No. 1:20-cv-00762-AWI-SAB |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING DISMISSING COMPLAINT FOR FAILURE TO STATE A CLAIM |
| v. | |
| UNITED STATES DEPARTMENT OF JUSTICE, et al., | (ECF No. 1) |
| Defendants. | OBJECTIONS DUE WITHIN THIRTY DAYS |

Refugio Carrillo ("Plaintiff"), proceeding *pro se* and *in forma pauperis*, filed this action pursuant to <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), which provides a remedy for violation of civil rights by federal actors. Currently before the Court is Plaintiff's complaint, filed June 2, 2020.

## I.

## SCREENING

Notwithstanding any filing fee, the court shall dismiss a case if at any time the Court determines that the complaint "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2); <u>see</u> <u>Lopez v. Smith</u>, 203 F.3d 1122, 1129 (9th Cir. 2000) (section 1915(e) applies to all *in forma pauperis* complaints, not just those filed by prisoners);

1

1  Calhoun v. Stahl, 254 F.3d 845 (9th Cir. 2001) (dismissal required of *in forma pauperis*

2  proceedings which seek monetary relief from immune defendants); Cato v. United States, 70

3  F.3d 1103, 1106 (9th Cir. 1995) (district court has discretion to dismiss *in forma pauperis*

4  complaint under 28 U.S.C. § 1915(e)); Barren v. Harrington, 152 F.3d 1193 (9th Cir. 1998)

5  (affirming *sua sponte* dismissal for failure to state a claim).  The Court exercises its discretion to

6  screen the plaintiff's complaint in this action to determine if it "(i) is frivolous or malicious; (ii)

7  fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a

8  defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2).

9       In determining whether a complaint fails to state a claim, the Court uses the same

10  pleading standard used under Federal Rule of Civil Procedure 8(a).  A complaint must contain "a

11  short and plain statement of the claim showing that the pleader is entitled to relief. . . ." Fed. R.

12  Civ. P. 8(a)(2).  Detailed factual allegations are not required, but "[t]hreadbare recitals of the

13  elements of a cause of action, supported by mere conclusory statements, do not suffice."

14  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S.

15  544, 555 (2007)).

16       In reviewing the *pro se* complaint, the Court is to liberally construe the pleadings and

17  accept as true all factual allegations contained in the complaint.  Erickson v. Pardus, 551 U.S. 89,

18  94 (2007).  Although a court must accept as true all factual allegations contained in a complaint,

19  a court need not accept a plaintiff's legal conclusions as true.  Iqbal, 556 U.S. at 678.  "[A]

20  complaint [that] pleads facts that are 'merely consistent with' a defendant's liability . . . 'stops

21  short of the line between possibility and plausibility of entitlement to relief.'"  Id. (quoting

22  Twombly, 550 U.S. at 557).  Therefore, the complaint must contain sufficient factual content for

23  the court to draw the reasonable conclusion that the defendant is liable for the misconduct

24  alleged.  Iqbal, 556 U.S. at 678.

25                                    **II.**

26                         **ALLEGATIONS IN COMPLAINT**

27       The Court accepts Plaintiff's allegations in the complaint as true only for the purpose of

28  the *sua sponte* screening requirement under 28 U.S.C. § 1915.

Plaintiff brings this action against the Department of Justice Civil Division, Tort Claims Branch, James G. Tooghey, Jr., Director of Tort Claims; Hope L. Swann, Paralegal Specialist; Marth Hirschfield, Attorney Advisor for the Office of the Inspector General; Cecilia Besse, Acting General Counsel for the Office of the Inspector General; and Brent McIntosh, General Counsel for the United States Department of the Treasury.  Plaintiff alleges violations of the right to due process, the Ninth Amendment, and the Fourteenth Amendment due to the denial of a claim he submitted under the Federal Tort Claims Act ("FTCA").  He is seeking eleven trillion dollars for being kidnapped twice by the Department of Justice ("DOJ") and a trade mark that he allegedly owns.  Plaintiff seeks to stop and desist harassment and stalking by the DOJ.

Plaintiff references his statement of claim that was attached to his Administrative Tort Claim.  His claim was initially denied on December 10, 2018 because he had not included the request for a sum certain rendering it invalid.  (December 10, 2018 Letter from Hope Swann, ECF No. 1 at 10.[1])  Plaintiff submitted an administrative tort claim that was denied on April 2, 2019 because it was not signed.  (April 2, 2019 Letter from Hope Swann, Id. at 38.)   On December 18, 2018, it was recommended that the claim be denied because the DOJ found his claims to be "absurd and nonsensical."  (Administrative Claim Recommendation: Absurd, Id. at 9.)  It is unknown what the claims were that these decisions addressed.

Plaintiff's statement of claim, dated May 1, 2020, asserts that the defendants claim is without merit and once he proves kidnapping they can write him a check or transfer funds. (Statement of Claim, Id. at 11.)  Hope Swann found his claim to be absurd and nonsensical but she is not a business appraiser.  (Id.)  Plaintiff contends that the DOJ failed to act because of white supremacy loyalty throughout the DOJ.  (Id.)  The defendants claim that Plaintiff's claim includes allegations of bizarre and outrageous acts of the DOJ and the defendants should be worried because the attachment directly states the knowledge of known individuals in the DOJ. (Id. at 12.)  Plaintiff states that the defendants found that his assertions are absurd, but absurd is inapplicable here.  (Id.)  Plaintiff agrees that the claims are incredible but states that they are

---

[1] All references to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

1   factual and can be proven.   (Id.)   While the defendants found that Plaintiff's claims are

2   sufficiently fantastic to defy reality and they know it, he asks who they are.   (Id.)   Finally, the

3   defendants found that Plaintiff had brought claims against unknown employees and that his

4   claims were without merit.   (Id.)   Plaintiff states that he has been writing to the DOJ for almost

5   three years and this is the first response he has received and it causes him to question the

6   integrity of the defendants with regards to the FTCA and the USSO[2] "which is a lighter way to

7   put murder, kidnaping and racketeering lightly."   (Id.)

8       Plaintiff states that the rejection of his claim because it did not request a sum certain is

9   actually more than absurd because his Electric Taxi Cab Company is valued at over 1 trillion

10   dollars and he owns this trademark.   (Id. at 13.)   Plaintiff knows that the Defendants are white

11   supremacy members and that if the office was full of blacks and Hispanics he would have

12   received the money for his injuries.   (Id.)   Plaintiff contends that one of the objectives is to keep

13   whites out of prison and asks how it will look when they have to put away a handful of white

14   judges for life.   (Id.)   Plaintiff states that nevertheless he is a patriot and will lower the amount

15   requested to 500 billion dollars, but that if a lawsuit has to be filed he will be requesting 114

16   trillion dollars because he is charging 900 percent interest since the date of his injury.   (Id.)

17       Plaintiff also owns a trademark for his injured corporation, Secure Equity Investments

18   Corporation.   (Id.)   This trademark belongs to him because it pertains to his religion.   (Id.)   He

19   plans to sue the Government for his intellectual property that was lost or stolen as well as any

20   lost market shares or profits.   (Id.)   If he is unable to sue, Plaintiff will sue because is not able to

21   sue.   (Id.)

22       In 1994, Plaintiff and his friends were at the Delano Bowling Alley and were attacked by

23   a bunch of weapon wielding maniacs.   (Id. at 14.)   They only made it out by running through a

---

[2] It is unclear what Plaintiff is referring to by "USSO".   Based on the allegations in the complaint it would appear that this might reference United States Sheriff's Office.   While Plaintiff alleges actions taken by the United States Department of Justice and the Federal Bureau of Prisons, it seems clear from his statement of claims that the acts alleged involved local police and sheriff's employees which would be municipal action.   Plaintiff also alleges acts by judges in his state court criminal case which would be state action.   Finally, Plaintiff also complains of actions by private individuals that he claims are "friends of the court".   None of the acts alleged appear to be taken by federal employees or can be attributed to federal employees.   It is unclear why Plaintiff has filed a FTCA claim other than he is attributing all local law enforcement action to the federal government.   Plaintiff seems to be contending that all law enforcement are federal officers.

1    storm of bullets.  (Id.)  This same year he was walking home from playing basketball when a

2    Tulare police officer stopped him and took his picture.  (Id.)  He was then let go.  (Id.)  An armed

3    assailant later broke into Plaintiff's house to attempt to murder him in his sleep.  (Id.)  The man

4    received a year in jail which was almost a reward.  (Id.)  Two weeks later a white supremacy

5    biker showed up and picked a fight with Plaintiff.  (Id. at 15.)  Plaintiff had a cast on his arm and

6    won with one hand tied behind his back.  (Id.)  Plaintiff went out with a girl related to the biker

7    that he beat up and the cops showed up.  (Id.)  Since then, every time Plaintiff has sex or makes

8    money the cops show up.  (Id.)

9          Plaintiff was having sex with two white girls at an NFL player's house in 1996 and one

10   of the girls tried to stick a needle in his chest.  (Id.)  The needle did not break the skin and bent

11   90 degrees.  (Id.)

12         In 1997, Plaintiff and his friend went to Wasco to pick up some girls.  (Id.)  They stopped

13   at a store and were almost immediately attacked.  (Id.)  Plaintiff won the fight and then two guys

14   started throwing bottles so Plaintiff had to take care of it.  (Id.)  A car had parked behind Plaintiff

15   and he could not back out.  (Id.)  The store was completely surrounded and the "biggest baddest"

16   guy stepped in with a liquor bottle in his hands.  (Id.)  Plaintiff grabbed a full Strawberry Hill

17   bottle that someone had thrown through the back window of his truck and it was on.  (Id.)

18   Plaintiff made it out without a scratch, but the other guy. . . "may he rest in peace."  (Id.)

19         Plaintiff contends that these attempted murders by the State and their friends of the court

20   continued for just about every year of his life.  (Id.)  In 1999, his new vehicle was stolen by

21   white people who were friends of the court and he almost lost his job.  (Id.)

22         In 2003-2004, Plaintiff was attending the University of Phoenix to get a bachelor's

23   degree in business and purchased investment property.  (Id. at 16.)  The fire department burned

24   down the property and the insurance company would not pay him.  (Id.)  Plaintiff hired a lawyer,

25   Daniel Rodriguez who held the case for 18 months and then would not sue.  (Id.)  Plaintiff hired

26   another lawyer, Gerald Levertt who settled the case without Plaintiff's consent.  (Id.)  Plaintiff

27   notified the State Bar and nothing was done.  (Id.)  In 2006-2007, Plaintiff had to pull out his

28   401K to repair the investment property.  (Id.)

In 2005, Plaintiff wrote a business plan for Secure Equity Investments Corporation and registered a trademark in 2007. (Id.) In 2008, Plaintiff was arrested at his job at Ikea on false charges by Detective Watts. (Id.) The case was dismissed by the judge while the jury was in deliberations. (Id.) As Plaintiff was walking down the hall to be released he heard someone yell a year. (Id.) This was the first kidnapping. (Id.) During Plaintiff's court appearances, Judge Macdimire had two white people that he knew show up in court and asked them to walk up to the bench. (Id.) He did the same thing in 2014. (Id.)

Plaintiff was assaulted several times while he was in custody and was made to fight other inmates five times by prison guards. (Id.) They moved Plaintiff around the cells trying to find someone who could kick Plaintiff's ass. (Id.) A sergeant and three guards eventually came to his cell and hit him, removing his documentation from him. (Id.) When Plaintiff was released from prison in 2008, he filed a complaint with the bureau of prisons and with internal investigations. (Id.)

Plaintiff went to college from 2009 and 2011 and was recruited by Paramont Farms. (Id. at 17.) Plaintiff was sexually assaulted three weeks into the job by Eldon Jones. (Id.) Mr. Jones assaulted him two more times and Plaintiff reported it to Human Resources. (Id.) Plaintiff was fired. (Id.) He contacted the State Bar to find a lawyer and they did not respond. (Id.) He filed a complaint with the EEOC and they did not find any discrimination. (Id.) Plaintiff hired a lawyer who accepted his case a week before the statute of limitations was up and the lawyer changed his mind and did not want to sue. (Id.) Plaintiff reported this to the State Bar and nothing was done. (Id.) The lawyer retired and Plaintiff has been stripped of his right to sue and he is still required to pay taxes. (Id.) Since 2009, the news stations have refused to cover any part of Plaintiff's story. (Id.)

Plaintiff started the Electric Cab Corporation and registered a trademark in 2012. (Id.) In 2013, the Bakersfield Police Department kicked Plaintiff off his property. (Id.) The Bakersfield Police Department followed Plaintiff everywhere and checked how much money he had in his pockets. (Id.) They arrested Plaintiff for trespassing and hired a friend of the court to kill him. (Id.) The person swung a knife at Plaintiff's throat and assaulted him two more times on camera.

1   (Id.)  Plaintiff raised his hands and told the person to stop because he was nonviolent.  (Id.)

2   Plaintiff was arrested.  (Id.)  Plaintiff was held to the date of the expiration of his first trademark

3   and the six months after to cover the time allowed for filing a statement of use.  (Id.)

4         Around August 2013, Plaintiff posted on Facebook that he was interested in running for

5   President of the United States.  (Id.)

6         On October 30, 2013, Plaintiff reported to the police that his children had told him that

7   their uncle had assaulted them.  (Id. at 18.)  Plaintiff filed a police report and was arrested.  (Id.)

8   The uncle had blown a drug or poison smoke in his children's face and the police protected him.

9   (Id.)

10        In November, Plaintiff was released and his children had been removed from his custody.

11  (Id.)  He went to their school to visit his children and the Delano Police Department showed up.

12  (Id.)  A police officer made an aggressive facial expression to his children and made them cry.

13  (Id.)  Plaintiff was arrested in front of his children.  (Id.)

14        On January 20, 2014, Plaintiff reported al-Quida terrorists to the Bakersfield Police

15  Department.  (Id.)  On April 25, two Bakersfield police officers came and kicked him off his

16  property.  (Id.)  Plaintiff was running his Electric Taxi Cab Corporation from this location, his

17  office at 1430 Truxtun Avenue, and a property on Hughes Lane.  (Id.)  The terrorists had been

18  spotted in that area.  (Id.)

19        The Bakersfield Police Department followed Plaintiff everywhere.  (Id.)  On June 3,

20  Plaintiff called 9-1-1 to report that Officer Perez and Officer White were trying to steal his

21  mobile office.  (Id.)  Plaintiff was followed to the grocery store and the trespassing arrests began.

22  (Id.)

23        Plaintiff was arrested for misdemeanor assault with a deadly weapon and exhibiting a

24  weapon on June 23, 2014.  (Id. at 19.)  When he was arrested, Plaintiff was raising his hands and

25  saying, "Stop, I am not violent.  I am not going to fight you."  (Id.)  This was when the friend of

26  the court attacked Plaintiff three times without provocation.  (Id.)  Plaintiff was held for over

27  thirteen months without getting a jury trial.  (Id.)

28        When he was arrested the sheriff's department changed his date of birth at intake.  (Id.)

1  When Plaintiff complained about it, he was put in chains, beat up and carried downstairs where
2  two sheriff's officers repeatedly jumped on his back.  (Id.)  The charge of obstructing was later
3  dismissed.  (Id.)  He was held on the charge and received time served.  (Id.)  Judge Benavidez
4  might have been responsible for poisoning Plaintiff.  (Id.)  He looked at the size of Plaintiff's
5  arms and became angry.  (Id.)  Plaintiff's cell did not open until court dates and he lost almost
6  fifty pounds in over two months.  (Id.)  Plaintiff's public defender covered the microphone and
7  told Plaintiff, "If you do not plead guilty, the police will kill you and your children?"  (Id.)

8      During his criminal case, a court appointed doctor found Plaintiff competent, but the
9  judge said Plaintiff was incompetent and sent him to a mental institution.  (Id. at 21.)  The judge
10  said that Plaintiff had delusions of grandeur because he said he owned a corporation and he was
11  Hispanic.  (Id.)

12      The doctor asked Plaintiff after he arrived if he still believed that he owned his own
13  corporation.   When Plaintiff answered, "I am the CEO and president of Electric Cab
14  Corporation."  (Id.)  The doctor said one more month.  (Id.)  The Patton Hospital doctors
15  eventually researched and discovery that Plaintiff did own his own company.  (Id.)  Plaintiff was
16  returned to court and there was not a prosecutor although it was the last day for trial on his
17  felony case.  (Id.)  The case was supposed to be dismissed but the charges were refiled on the last
18  day.  (Id.)

19      Plaintiff does not have any mental health issues, nor has he ever had any in this life.  (Id.
20  at 22.)  Plaintiff has never done anything illegal or been involved in anything that is illegal.  (Id.)
21  Plaintiff is forty years old and owns two corporations.  (Id.)  His only problem is that he is not a
22  white person.  (Id.)  Plaintiff is on unemployment which will run out on February 19, 2019.  (Id.)

23      Plaintiff reported all of this to the Federal Bureau of Investigations and the Central
24  Intelligence Agency in December 2014, by asking the Kern County Sheriffs to forward his
25  letters.  (Id.)  While Plaintiff was in custody his registered trademark for The Science and Ethics
26  Illuminati Church was due for renewal or reporting and it lapsed.  (Id. at 23.)  The Electric Taxi
27  Cab Corporations web domains were also up for renewal.  (Id.)

28      In July 2017, Plaintiff found a job as an industrial electrician.  (Id.)  In his third month on

the job, Plaintiff's white supervisor told him to stick his leg into a mill machine.  (Id.)  Plaintiff stated he was still trouble shooting.  (Id.)  The supervisor hit Plaintiff across the chest with the back of his hand.  (Id.)  Plaintiff did not respond.  (Id.)  Plaintiff called the police, filed a police report, and pressed charges.  (Id.)  Plaintiff was told to go home while they conducted an investigation.  (Id.)  Two weeks later, they called Plaintiff and told him he was fired without providing a reason.  (Id.)  Plaintiff filed a complaint with the EEOC and was told to keep it short during the interview.  (Id.)  The EEOC did not find discrimination.  (Id.)  A lawyer accepted the case in October 2017 and then changed his mind.  (Id. at 24.)

In February 2018, Plaintiff found another job as an electrician.  (Id.)  Six months into the job, his white manager and white supervisor told him to quit or else.  (Id.)  Plaintiff was harassed about quitting for a week.  (Id.)  The manager came to see Plaintiff and, when they got to Human Resources, the manager screamed at him to sit down and pushed Plaintiff into a chair.  (Id.)  Plaintiff called 9-1-1 and filed a police report.  (Id.)  Plaintiff was sent home without pay.  (Id.)  When Plaintiff was called for an investigation interview, he was asked about calling OSHA and questions about his religion.  (Id.)  Plaintiff recorded three investigation interviews.  (Id.)  He was fired.  (Id.)  He filed a complaint with the EEOC and they did not find discrimination.  (Id.)  During the investigation, Michael Kerr called Plaintiff and asked him six times if he knew anyone else who had called OSHA.  (Id.)  Plaintiff asked Mr. Kerr if he was racist and Mr. Kerr hung up on him.  (Id.)

On May 18, Plaintiff reported a confined space safety violation to OSHA.  (Id. at 25.)  He alleges that he was fired in retaliation for this report.  (Id.)  Plaintiff was advised to file a retaliation complaint with the Department of Labor and did so.  (Id.)  The case is ongoing, although he has been told that a white person filed a similar complaint and has his job back and a settlement in less than 30 days.  (Id.)

In 2018, Plaintiff was offered a job with E and J Gallo Winery.  (Id.)  Plaintiff accepted and passed all tests.  (Id.)  After reviewing Plaintiff's background, they changed their minds about hiring him stating it was because he had a prior misdemeanor.  (Id.)  Plaintiff reported this to the Department of Fair Housing and Employment ("DFHE").  (Id.)  Camille Hunley from the

DFHE said the matter had settled but there was no money for Plaintiff.  (Id.)

In September 2018, Plaintiff was offered a job by Rio Tinto Mineral.  (Id.)  Plaintiff accepted and passed all testing.  (Id.)  After reviewing his background, they called him and stated they charged their minds.  (Id.)  Plaintiff reported this to the DFHE and the investigation is ongoing.  (Id.)

In October 2018, Plaintiff discovered that the state child support office was stealing money from his child support payments.  (Id. at 26.)  Plaintiff reported this to the DOJ and FBI.  (Id.)

In November 2018, Plaintiff received a job offer from General Atomics.  (Id.)  After they reviewed his background check, they changed their minds about hiring him.  (Id.)

In December 2018, Plaintiff took a live scan to get his criminal history report from the DOJ.  (Id.)  Plaintiff received a report that is doctored up.  (Id.)  There are charges that were never presented in court and sealed records that were opened after probation had been completed.  (Id.)

On January 30, 2019, Plaintiff received a letter from the state bar stating that they refused to refer him to a lawyer.  (Id.)

On February 1, 2019, Plaintiff's religion page was removed from Facebook.  (Id.)  Plaintiff contacted Facebook but has received no response.  (Id.)  On February 12, Gloria Cannon was stalking Plaintiff at the Beale library.  (Id. at 27.)  Plaintiff reported this to the FBI.  (Id.)  For several weeks, the police have been stopping people on Plaintiff's street and where he goes to apply for jobs and they only give tickets to Mexicans.  (Id.)

On February 20, 2019, Plaintiff dropped a file with the Bakersfield police chief, internal investigations, and the Mayor's Office.  (Id.)  Up to February 27, Plaintiff has been seeing twenty plus law enforcement vehicles where he previously had only seen one or two a day.  (Id.)

On February 26, 2019, there were no electrician jobs on the state Cal Jobs website.  (Id.)  On February 27, 2019, Plaintiff posted pictures of the police stalking him.  (Id.)  At 5:44, Plaintiff received a call that the EEOC had decided not to pursue his charges.  (Id.)  When Plaintiff asked based on what evidence, he was told a text message.  (Id.)  Plaintiff states that this

1    text message must be false because he has never made racial slurs.  (<u>Id.</u> at 27-28.)

2          In March 2019, Plaintiff started posting pictures of the police online because he is so tired

3    of them following him.  (<u>Id.</u> at 28.)  He contracted Channel 23 in Bakersfield but has received no

4    answer.  (<u>Id.</u>)  He reported their refusal to cover minority stories to the Federal Communications

5    Commission.  (<u>Id.</u>)

6          On March 11, 2019, the police stopped following Plaintiff and now it is just official city

7    government cars.  (<u>Id.</u>)  Plaintiff was approached by a sheriff on March 12, 2019.  (<u>Id.</u>)  Plaintiff

8    had almost just lost his life due to the sheriff's reckless behavior.  (<u>Id.</u>)  The sheriff tried to

9    associate Plaintiff with a crime and he stated that he was offended and asked the sheriff to leave

10   him alone.  (<u>Id.</u>)  The sheriff would not, so Plaintiff called 9-1-1.  (<u>Id.</u>)  Sergeant Baladeros

11   arrived and started harassing Plaintiff so he called 9-1-1 several more times.  (<u>Id.</u>)  Sergeant

12   Baladeros asked Plaintiff about the letter that he wrote and told Plaintiff that emails are not

13   protected like mail.  (<u>Id.</u>)  Plaintiff believes that they are hacking.  (<u>Id.</u>)  Plaintiff took Sergeant

14   Baladeros picture and he was detained without probable cause, not because he broke any laws,

15   but because he is Hispanic and was driving a vehicle.  (<u>Id.</u>)

16         On March 12, 2019, Plaintiff received a right to sue letter from the EEOC regarding his

17   suit against the Neil Jones Food Company.  (<u>Id.</u> at 29.)  The EEOC did not find religious

18   discrimination even though Plaintiff recorded human resources asking him illegal questions

19   about his religion.  (<u>Id.</u>)

20         On March 13, 2019, Plaintiff sent an email to the Kern County Sheriff's Department and

21   the Tulare County Sheriff's Department requesting information on their internal investigations

22   department and how to file a complaint.  (<u>Id.</u>)  Plaintiff filed reports on March 13, 2019.  (<u>Id.</u>)

23         On April 8, 2019, Plaintiff received a call from Sergeant Papula who verified that there

24   was video footage of the March 12 incident.  (<u>Id.</u>)  Plaintiff filed a complaint with the County of

25   Tulare internal affairs.  (<u>Id.</u>)

26         Plaintiff was laid off from his job at JG Boswell on August 30 for discussing safety with

27   a coworker and having other perfectly normal conversations.  (<u>Id.</u>)

28         On January 6, 2020, Plaintiff received a letter stating that his DOJ claim was denied

1  because the amount was absurd.  (Id. at 30.)

2  **III.**

3  **DISCUSSION**

4  In this action, Plaintiff is attempting to sue employees of the United States because he

5  filed a claim under the FTCA that was denied.  Plaintiff alleges that the denial of this claim

6  violates his right to due process, the Ninth Amendment, and the Fourteenth Amendment.

7  Congress passed 42 U.S.C. § 1983 which entitles an injured person to sue for monetary

8  damages if a state official violates his or her constitutional rights.  However, "Congress did not

9  create an analogous statute for federal officials."  Ziglar v. Abbasi, 137 S. Ct. 1843, 1854 (2017).

10  In Bivens, the Supreme Court held that, even absent statutory authorization, a federal official

11  could be sued for damages for an unreasonable search and seizure in violation of the Fourth

12  Amendment.  Bivens, 403 U.S. at 397; see Lanuza v. Love, 899 F.3d 1019, 1021 (9th Cir. 2018)

13  ("Bivens is the first Supreme Court decision to recognize an implied right of action for damages

14  against federal officers alleged to have violated a plaintiff's constitutional rights.").  Since

15  Bivens was decided the Supreme Court has recognized an implied cause of action in two other

16  cases involving other constitutional violations.  Id.

17  In Ziglar, the Supreme Court set forth a two-part test for courts to use in order to

18  determine whether a Bivens claim may proceed.  Ziglar, 137 S. Ct. at 1859-60.  First, the court

19  must determine whether the case presents a new Bivens context.  "If [a] case is different in a

20  meaningful way from previous Bivens cases decided by [the Supreme Court], the context is

21  new." Id. at 1859.

22  Second, if a case presents a new context for a Bivens action, the court must then

23  determine whether there are any "special factors counselling hesitation in the absence of

24  affirmative action by Congress."  Ziglar, 137 S. Ct. at 1857 (citation omitted).  The "special

25  factors" inquiry "must concentrate on whether the Judiciary is well suited, absent congressional

26  action or instruction, to consider and weigh the costs and benefits of allowing a damages action

27  to proceed.'"  Id. at 1857-58.  Ziglar specifically noted that, "if there is an affirmative remedial

28  structure present in a certain case, that alone may limit the power of the Judiciary to infer a new

Bivens cause of action." Ziglar, 137 S. Ct. at 1858.  "In sum, if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts must refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III." Id.; see also id. at 1857 (stating that the Supreme Court has made it "clear that expanding the Bivens remedy is now a 'disfavored' judicial activity," which is "in accord with the Court's observation that it has 'consistently refused to extend Bivens to any new context or new category of defendants.'"  (internal citations omitted)).  Therefore, the Court considers if there is an implied Bivens cause of action for access to the courts.

### 1.   Plaintiff's Ninth Amendment Claim is Not Cognizable

Plaintiff alleges that the denial of his FTCA claim violates the Ninth Amendment.  The Ninth Amendment provides that "the enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." Strandberg v. City of Helena, 791 F.2d 744, 748 (9th Cir. 1986).  While "[i]t has been argued that the ninth amendment protects rights not enunciated in the first eight amendments[,] "the ninth amendment has never been recognized as independently securing any constitutional right, for purposes of pursuing a civil rights claim." Strandberg, 791 F.2d at 748; accord Schowengerdt v. United States, 944 F.2d 483, 490 (9th Cir. 1991); Montana Caregivers Ass'n, LLC v. United States, 526 F. App'x 756, 758 (9th Cir. 2013) (unpublished);[3] see also San Diego Cty. Gun Rights Comm. v. Reno, 98 F.3d 1121, 1125 (9th Cir. 1996) (rejecting argument that Ninth Amendment encompasses right to bear firearms).  The Ninth Circuit has never recognized the Ninth Amendment as a valid ground for a claim under section 1983. Nickler v. Cty. of Clark, 752 F. App'x 427, 429 (9th Cir. 2018).  The Ninth Amendment is simply a rule on how to read the constitution. Montana Caregivers Ass'n, LLC v. United States, 841 F.Supp.2d 1147, 1150 (D. Mont. 2012), aff'd, 526 F. App'x 756 (9th Cir. 2013).  Causes of action based on the Ninth Amendment fail to state a legal claim. Ralls v.

---

[3] Unpublished dispositions and orders of this Court issued on or after January 1, 2007 may be cited to the courts of this circuit in accordance with FRAP 32.1.  Ninth Circuit Rule 36-3(b); see Animal Legal Def. Fund v. Veneman, 490 F.3d 725, 733 (9th Cir. 2007) ("as of January 1, 2007, we must now allow parties to cite even unpublished dispositions and unpublished orders as persuasive authority").

1  Facebook, 221 F.Supp.3d 1237, 1245 (W.D. Wash. 2016).

2      Since Plaintiff cannot state a claim under the Ninth Amendment, the Court need not

3  address Bivens in this context.

4          2.      Plaintiff's Due Process Claim Presents a New Bivens Context

5      Plaintiff alleges deprivation of due process in violation of the Fifth and Fourteenth

6  Amendments.   The named defendants here are federal actors as they all work for federal

7  agencies.   The commands of the Fourteenth Amendment are directed to the states or to state

8  actors.  D.C. v. Carter, 409 U.S. 418, 423 (1973).  "The actions of the Federal Government and

9  its officers are beyond the purview of the [Fourteenth] Amendment."  D.C., 409 U.S. at 423.

10  The Fourteenth Amendment applies to actions of the state officials, not to the actions of federal

11  government officials.  San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm., 483 U.S.

12  522, 543, n.21 (1987); Hall v. Mueller, 84 F. App'x 814, 815 (9th Cir. 2003).  It is the Fifth

13  Amendment's due process clause that applies to the federal government.  Bingue v. Prunchak,

14  512 F.3d 1169, 1174 (9th Cir. 2008).  The Court therefore considers whether a Bivens claim can

15  be found for violation of the Fifth Amendment.

16      The Supreme Court has implied a damages remedy under the U.S. Constitution in only

17  three contexts: (1) Fourth Amendment unreasonable search and seizure in Bivens, 403 U.S. at

18  396-97; (2) Fifth Amendment gender discrimination in Davis v. Passman, 442 U.S. 228, 248-49

19  (1979); and (3) Eighth Amendment deliberate indifference to serious medical needs in Carlson v.

20  Green, 446 U.S. 14, 19 (1980).  "These three cases – Bivens, Davis, and Carlson – represent the

21  only instances in which the Court has approved of an implied damages remedy under the

22  Constitution itself."  Ziglar, 137 S. Ct. at 1855.

23      "If the case is different in a meaningful way from previous Bivens cases decided by [the

24  Supreme] Court, then the context is new."  Ziglar, 137 S. Ct. at 1859.  In the instant case,

25  Plaintiff is alleging that he was denied due process by the denial of his FTCA claim.  None of the

26  prior cases finding an implied remedy under Bivens are similar to the facts of this matter.[4]

27  ───────────────
    [4] The Court finds that were Plaintiff to attempt to bring this claim alleging discrimination in violation of the Fifth
28  Amendment this would also present a new context.  While the Davis court did find a Bivens claim based on the
    allegation that an employee was fired based on gender discrimination, the claims here do not arise in the

1    Therefore, Plaintiff's claim for denial of due process based on the rejection of his FTCA claim

2    presents a new <u>Bivens</u> context.  Hence, the Court must evaluate whether special factors counsel

3    against extending the <u>Bivens</u> damages remedy to this new context.

4              3.    <u>Special Factors Counsel Against Extending the Bivens Remedy in this Case</u>

5          The Supreme Court has not defined what the special factors are that should be considered

6    in determining whether to extend a <u>Bivens</u> remedy in a new context.  <u>Ziglar</u>, 137 S. Ct. at 1857.

7    The Ninth Circuit has found that Ziglar's "special factors include: the rank of the officer

8    involved; whether Bivens is being used as a vehicle to alter an entity's policy; the burden on the

9    government if such claims are recognized; whether litigation would reveal sensitive information;

10   whether Congress has indicated that it does not wish to provide a remedy; whether there are

11   alternate avenues of relief available; and whether there is adequate deterrence absent a damages

12   remedy, among other factors.  <u>Lanuza v. Love</u>, 899 F.3d 1019, 1028 (9th Cir. 2018).  But, "the

13   inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or

14   instruction, to consider and weigh the costs and benefits of allowing a damages action to

15   proceed.  Thus, to be a 'special factor counselling hesitation,' a factor must cause a court to

16   hesitate before answering that question in the affirmative."  <u>Ziglar</u>, 137 S. Ct. at 1857–58.  <u>Ziglar</u>

17   made it clear that, though extension of <u>Bivens</u> is disfavored, the remedy "may still be available in

18   a case against an individual federal officer who violates a person's constitutional rights while

19   acting in his official capacity."  <u>Lanuza</u>, 899 F.3d at 1028.

20         Here, the Court finds that special factors counsel hesitation in implying a <u>Bivens</u> damages

21   remedy in the context of a Fifth Amendment claim for denial of a FTCA claim for the following

22   reasons.

23         First, the Supreme Court considered whether to extend <u>Bivens</u> to a new Fifth Amendment

24   claim in <u>Ziglar</u>.  The Court recognized that a Fifth Amendment <u>Bivens</u> claim had been permitted

25   in <u>Davis</u>.  <u>Ziglar</u>, 137 S. Ct. at 1854-55.  In <u>Davis</u>, a congressman had been sued by an

26   administrative assistant for firing her because she was a woman.  <u>Id.</u>  The <u>Davis</u> court found a

27
28   employment context.  Rather, Plaintiff is alleging that his claim to be allowed to sue the United States for damages
     was denied because it was found to be absurd.  This is a meaningful difference which presents a new context for the
     Fifth Amendment claim.

Bivens damages remedy existed for gender discrimination.  Id.  The Supreme Court has declined to extend a Bivens remedy for alleged due process violations and discrimination in the following cases: "a race-discrimination suit against military officers, Chappell v. Wallace, 462 U.S. 296, 297, 304–305, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983); a substantive due process suit against military officers, United States v. Stanley, 483 U.S. 669, 671–672, 683–684, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987); a procedural due process suit against Social Security officials, Schweiker v. Chilicky, 487 U.S. 412, 414, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988); a procedural due process suit against a federal agency for wrongful termination, FDIC v. Meyer, 510 U.S. 471, 473–474, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994); . . . a due process suit against officials from the Bureau of Land Management, Wilkie v. Robbins, 551 U.S. 537, 547–548, 562, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007)[.]  Ziglar, 137 S. Ct. at 1857.

In Ziglar, the Supreme Court considered whether to extend an implied damages remedy to the plaintiffs' claims that they were denied "due process and equal protection rights by holding them in restrictive conditions of confinement; the claims further allege that the Wardens violated the Fourth and Fifth Amendments by subjecting respondents to frequent strip searches." Ziglar, 137 S. Ct. at 1858.  The Court declined to find a Bivens remedy existed for the plaintiffs claims that the detention policies violated the Fifth Amendment.  Id. at 1859-63.

Second, Plaintiff's claim in this action is that his FTCA claim was denied.  However, Plaintiff's injuries alleged in the statement of claim are not due to the actions of federal officials. "In 1946, Congress passed the FTCA, which waived the sovereign immunity of the United States for certain torts committed by federal employees."  FDIC, 510 U.S. at 475–76 (citing 28 U.S.C. § 1346(b)).  Here, Plaintiff's statement of claim does not allege any tort that was committed by a federal actor.  Rather the incidents that are alleged were committed by municipal or state actors or by private individuals.  Because Plaintiff has not identified a covered tort that was committed by a federal official, he does not have a claim under the FTCA.

Third, Ziglar "counseled against allowing a Bivens remedy if there is an 'alternative, existing process for protecting the [injured party's] interest.' "  Lanuza, 899 F.3d at 1031 (quoting Ziglar, 137 S.Ct. at 1858).  In this instance, Plaintiff has an alternate remedial structure

for asserting his claims against the individuals that he asserts violated his rights as set forth in the statement of claim.  Plaintiff could brings his claims in state court or, to the extent that a constitutional claim exists, such claims could be brought against the individual actor in federal court.  The fact that Plaintiff has an alternate remedial structure for asserting the claims he wishes to pursue counsels against extending <u>Bivens</u> to the claims in this action.

Fourth, the Court finds that extending <u>Bivens</u> to Plaintiff's Fifth Amendment claim would substantially affect government operations and unduly burden federal officials who must defend against this suit in their personal capacities.  <u>Schwarz v. Meinberg</u>, 761 F. App'x 732, 735 (9th Cir. 2019) (declining to extend <u>Bivens</u> remedies to a plaintiff's access to courts claim under the First and Fifth Amendments and a Fifth Amendment claim regarding denial of plaintiff's request for camp placement); <u>see</u> <u>also</u> <u>Anderson v. Creighton</u>, 483 U.S. 635, 638 (1987) ("[P]ermitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.").

Here, Plaintiff's FTCA claim was denied as it was found to be absurd.  Requiring federal officials to defend against denying such claims would unduly inhibit the officials from discharging their duties.  It is unclear whether the claims set forth in the instant action contain the same allegations that were presented in Plaintiff's FTCA claim.  Although Plaintiff's allegations here do not meet the standard of being legally frivolous, at a minimum, they raise a question as to whether Plaintiff is totally grounded in reality.  Plaintiff contends that all the allegations in the statement of claim can be proven, but he has not alleged actions that could be attributed to any federal actor and his claim for eleven trillion dollars in damages is on its face absurd.  Requiring federal employees to defend from the denial of meritless, frivolous, or absurd claims would unduly inhibit them in performing their duties.  These factors also counsel against extending a <u>Bivens</u> remedy in this context.

For these reasons, the Court finds that special factors counsel hesitation in this context and, thus, declines to find an implied <u>Bivens</u> cause of action under the Fifth Amendment for the denial of Plaintiff's FTCA claim.  Consequently, Plaintiff has failed to state a cognizable claim

against the named defendants for denial of due process by denying his FTCA claim.  Since this is a deficiency that cannot be cured by amendment, the Court concludes that granting leave to amend would be futile.

### IV.

### CONCLUSION AND RECOMMENDATIONS

The Court finds that a <u>Bivens</u> remedy should not be extended to Plaintiff's Fifth Amendment claims in this action.  Since no <u>Bivens</u> remedy exists, there are no facts that Plaintiff could plead to cure the deficiencies in his complaint, and it would be futile to provide Plaintiff with an opportunity to amend.  <u>Lopez</u>, 203 F.3d at 1127; <u>Akhtar v. Mesa</u>, 698 F.3d 1202, 1213 (9th Cir. 2012).

Based on the foregoing, IT IS HEREBY RECOMMENDED that Plaintiff's complaint, filed June 2, 2020, be dismissed without leave to amend for failure to state a claim.

This findings and recommendations is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within thirty (30) days of service of this recommendation, Plaintiff may file written objections to this findings and recommendations with the court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  Plaintiff is advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 839 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   __June 5, 2020__                        _____

                                                           UNITED STATES MAGISTRATE JUDGE